**In the Matter of JESTO INDUSTRIES, INC., Debtor.**

**JESTO INDUSTRIES, INC., Plaintiff,**

**v.**

**Floyd SLAYTON, Defendant.**

**Bankruptcy No. 82–1723.**

**Adv. No. 82–714.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 3, 1983.

Russell S. Bogue, III, Tampa, Fla., for plaintiff.

Emily W. Lawyer, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 reorganization case. The matters under consideration in the above-styled adversary proceeding are (1) a complaint filed by Jesto Industries, Inc. (the Debtor) alleging fraudulent misrepresentation and inducement to execute a contract and (2) a counterclaim filed by Floyd Slayton, the Defendant-Counter Plaintiff (Slayton) alleging breach of contract.

A brief summary of the procedural background of this proceeding is necessary to place the matters under consideration in a proper perspective. On July 26, 1982, this proceeding was commenced by Jesto Industries, Inc. in the County Court of Pinellas County, Florida. The Defendant (Slayton) filed a counterclaim and on August 24, 1982, the Debtor filed a Voluntary Petition for Relief Under Chapter 11. Slayton then filed an application to remove the County Court action to the Bankruptcy Court and on September 24, 1982, the application was granted.

There is no doubt that the instant proceeding represents a "traditional common law action," as described by Justice Burger in his dissent in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) and as such is subject to the invalidation of the jurisdictional grant of the Bankruptcy Reform Act of 1978, Pub.L.

No. 95–598, 28 U.S.C. 1471 et seq. However, the proceeding was removed to this Court while the stay, granted by the plurality in *Marathon* was yet in force. Further, it progressed to trial prior to the expiration of the second deadline set by the United States Supreme Court, eg. December 24, 1982. However, a final judgment was not rendered within this time period.

Ordinarily, under these circumstances, the failure to enter the final judgment would compel a remand of this related proceeding to the District Court, however, pursuant to the Local Rule promulgated by the Judges of this District (effective December 27, 1982) all related proceedings are automatically referred to the Bankruptcy Judges. Thus, in accordance with the Local Rule, the Bankruptcy Court is directed to submit findings, conclusions and a proposed judgment to the District Judge unless the parties consent to the entry of judgment by the Bankruptcy Judge. Local Rule (d)(3)(B). In light of the foregoing, this matter is properly before the Court for findings, conclusions and a proposed final judgment or final judgment if the parties consent.

The facts relevant to the resolution of this controversy may be summarized as follows:

In April of 1982, Stephen J. Ayoub, President of the Debtor corporation, met with Floyd Slayton, a financial consultant to discuss the procurement of additional financing for the Debtor. Ayoub was primarily interested in obtaining a $500,000 loan guaranteed by the Small Business Administration (SBA loan) and approached Slayton for the purpose of making the necessary arrangements. To that end, the principals of the Debtor prepared and delivered to Slayton, a financial disclosure package for presentation to a commercial lender(s), which Slayton submitted to Commercial Credit Corporation for consideration. While the testimony supports a finding that Commercial Credit was unwilling to approve a SBA loan in the amount of $500,000 based on a review of the corporate "financials," the lender was willing to consider a

$100,000 "gap" or "interim" loan if secured by adequate collateral. The underlying theory of the interim financing arrangement was that while the Debtor would be benefited by the immediate influx of $100,000 into the corp., the secured lender would incur no risk on the interim loan while retaining the option to later approve a $500,000 take out if the financial position of the borrower strengthened during the coming months.

On May 27, 1982, Ayoub, on behalf of the Debtor, and Slayton entered into two agreements. The first, and most significant to this controversy, is an Agreement for Management Services (Pl's Exh. # 1) wherein the Debtor agreed to pay $6,000 over a period of three months to Slayton for a variety of consulting services, of which procuring new financing was only one. A $2,000 payment was made at the time of execution. The contract also provided that the Debtor was required to provide Slayton with all relevant financial data and to cooperate with Slayton in his efforts on the Debtor's behalf. It must be pointed out that despite the terms of this agreement, the testimony at trial revealed that Slayton's primary, if not sole, duty was to generate SBA financing and the primary, if not sole, function of the management contract was to provide a vehicle for payment of a broker's commission on a loan which, by its terms, does not allow for the same.

The Debtor contends that at the time the contract was signed, Slayton represented the SBA loan as "in the bag" and a "sure thing" and failed to disclose that the SBA loan had been rejected by Commercial Credit with only an "interim" loan application yet pending. Ayoub also contends that he executed the contract in reliance upon Slayton's misrepresentations of Commercial Credit's intent to approve the SBA loan. The Debtor, therefore, seeks damages in the amount of $2,000. (The amount paid by the Debtor at the time the contract was executed) minus the amount actually earned by Slayton.

In his counterclaim, Slayton contends that Debtor, by failing to provide current financial information to Slayton upon request, breached the contract and prevented him from performing the consulting duties outlined in the agreement. He also alleges breach of contract based on the Debtor's failure to compensate him for services performed.

■ Considering first the complaint filed by the Debtor seeking damages for fraudulent misrepresentation, it is necessary to determine whether the representations, if any, made by Slayton prior to executing the management contract, rise to the level of actionable fraud. The essential elements of actionable fraud are a false statement concerning a material fact, knowledge that the representation is false, an intent that the representation induce action and consequent injury by the party acting in reliance on the representation. *Huffstetler v. Our Home Life Insurance Co.,* 67 Fla. 324, 65 So. 1 (1914). Further, the party asserting the fraud has the burden of establishing each element. In this connection, there is no evidence in the record to establish that Slayton either affirmatively represented that the SBA loan had been approved by Commercial Credit or that he was aware of a loan rejection by Commercial Credit at the time the Management contract was executed. While there is dispute regarding Slayton's representation of Commercial Credit's intent to approve the loan sometime in the future, it is clear that statements or promises of events to occur in futuro are not a proper basis for fraud. *Hart v. Marbury,* 82 Fla. 317, 90 So. 173 (1921). From a practical standpoint, one who regularly engages in business and is thus familiar with business practice, is aware that substantial lending becomes absolute only upon the execution of the actual credit documents. As revealed by the testimony at trial, Ayoub had been actively seeking financing, although unsuccessfully, prior to engaging Slayton and was, therefore, familiar with the process. In light of the foregoing, it is evident that the Debtor failed to establish the requisite elements of fraud and, therefore, cannot prevail in this action.

■ The Defendant-Counter Plaintiff urges the Court to award $4,000 in dam-

ages, the amount due under the Management Contract, plus accrued interest, attorney's fees and costs due to the Debtor's alleged breach of contract. Slayton contends that the Debtor breached the Management Contract by failing to provide up-to-date financial information which would allow Slayton to complete an internal financial analysis and perform financial consulting services referred to in the contract. Further, the Debtor failed to compensate Slayton in accord with the terms of the contract.

While the Court recognizes that the Debtor breached this contractual obligation to provide Slayton with current financial data, it is clear that this failure constitutes an immaterial breach in light of the overriding purpose of the contract.

A separate final judgment will be entered in accordance with the foregoing.